[No. 15973. Department One. February 7, 1921.]

FRANK A. HILL, as Trustee, Respondent, v. WALVILLE LUMBER COMPANY, Appellant.[1]

CORPORATIONS (128, 129)—OFFICERS AND AGENTS—DEALINGS WITH AND FRAUD AS AGAINST CORPORATION OR SHAREHOLDERS. A banker's demand in temporary control of a corporation, to be reimbursed for interest, and a note given therefor, is not fraudulent, where he was trustee for a new corporation organized to help another out of difficulties, and agreed to "take" bonds of the new corporation at par, and borrowed money thereon to secure a working capital, at a higher interest rate than borne by the bonds; his demand for reimbursement for the difference in interest being acceded to by the adverse interest.

SAME (189-1)—CORPORATE BONDS—PURCHASE OF BONDS—OR LOAN OF CREDIT. There was not an actual purchase of bonds, but a mere loan of credit to a corporation which was bound to make reimbursement of the difference between the interest paid on the bonds and on money borrowed thereon, where a banker and associates agreed to "take" at par the bonds of a new corporation, which took over assets of another in difficulties, the banker to have temporary control of the corporation and to borrow money for a working capital, the matter being referred to as an "underwriting."

[1]Reported in 195 Pac. 247.

Appeal from a judgment of the superior court for Lewis county, Reynolds, J., entered December 17, 1919, upon findings in favor of the plaintiff, in an action on contract, after a trial on the merits. Affirmed.

*M. M. Lyter* and *Forney & Ponder* (*Hyman Zettler*, of counsel), for appellant.

*Raymond J. McMillan* and *Ernest K. Murray*, for respondent.

FULLERTON, J.—This is an action brought by Frank A. Hill, as trustee in bankruptcy of the property of Charles S. Gilchrist, against the Walville Lumber Company, a corporation, to recover upon two promissory notes, the one for fifteen hundred dollars, bearing date of September 8, 1914, and the other for six hundred and twenty-five dollars, bearing date of August 15, 1915, executed and delivered to Gilchrist by the lumber company at the times of their respective dates. The defense was want of consideration. The trial was had by the court sitting without a jury and resulted in a judgment in favor of Hill. The lumber company appeals.

The facts leading up to the execution of the notes and which are thought to show a want of consideration for their execution are in substance, these: In 1908, the Walworth & Neville Manufacturing Company was a corporation organized and doing business under the laws of the state of Michigan. It owned a lumber plant located in that state, and owned similar plants severally located in the states of Mississippi, Tennessee and Washington. The value of the plants in the first three of the states named is not shown by the record. The plant in the state of Washington was of considerable value, and consisted of timber lands and timber land contracts, a lumber mill, logging roads and

logging equipment, with the usual accessories that go with such property.

The corporation was heavily indebted, and in the month of October of the year named was unable to meet its obligations as they matured, and was placed in the hands of a committee selected by its creditors. This committee gave the officers of the company a year's time within which to extricate the company from its financial difficulties. The business was placed in the general charge of one William M. Carpenter, the corporation's vice-president, and this officer employed to assist him in the work one David B. Gann, an attorney of Chicago. As the work of settlement progressed, it was found that sufficient funds could not be raised from the eastern assets of the corporation to satisfy the creditors. There was needed some one hundred and twenty-five thousand dollars in cash more than they were able to obtain from that source, and Mr. Gann came to the state of Washington for the purpose of raising this sum upon the corporation's assets in this state.

The indebtedness of the corporation exceeded one million dollars. Of this sum, more than three hundred and fifty thousand dollars was owing to creditors within the state of Washington, a large part of which was secured by mortgages on the company's property situated in this state. Among its unsecured indebtedness, was an obligation of some seventy-five thousand dollars for money advanced by the United States National Bank of Chehalis. Of this bank, Charles S. Gilchrist was vice-president and manager, and one of its principal stockholders. Associated with him as stockholders were F. B. Hubbard, George Dysart, J. T. Veness, George E. Burge, and J. W. Daubney, certain of whom were also trustees of the bank.

On reaching this state, Mr. Gann sought the assistance of Mr. Gilchrist in raising the money necessary to satisfy the corporation's creditors. Various conferences were had between them in some of which the cotrustees of Mr. Gilchrist in the bank above named participated. The interest of Mr. Gilchrist and his cotrustees in the scheme arose from the fact that they desired to save the corporation from its imminent bankruptcy, in the hope that it might ultimately pay the somewhat large indebtedness due their bank. The parties finally reached an agreement at a conference held in Portland, Oregon. It was reduced in writing in the form of letters passing from Gann to Gilchrist on the one side, and from Gilchrist to Gann on the other, both of which were dictated by Gann. The letter from Gann to Gilchrist (omitting the immaterial matters) was as follows:

"In confirmation of the final arrangement settled upon here yesterday in regard to the reorganization of the affairs of the Walworth & Neville Manufacturing Company, we beg to say that we shall at once proceed to take steps looking to the organization of the East and West Companies as outlined. The West Company, to be called the Walville Lumber Company, is to be organized in Washington and will take over the Walville plant, lands, timber, equipment, right to use of all the special cross-arm machinery, and the wharf and agency interest of the present concern. The plant, lands and timber are to be bonded for $650,000 payable in equal annual installments over a period of not to exceed 10 years, with interest at 6% payable semi-annually; $125,000 of these bonds you are to take at par and with this and other money which we shall raise, the remaining $525,000 of bonds, or such part of them as may be required and possibly some of the Eastern assets, we are to make a settlement with our creditors. The Centralia indebtedness of approximately $75,000 is to be shifted to the East Company and assumed by it and when our affairs have been re-

adjusted, if any West bonds remain, we will apply them, if you then so desire, to the payment of the $75,000; otherwise this $75,000 is to be reduced in at least the same proportion, as future payment shall be made to the other general creditors.

"We are relying upon you to assist us in arranging the management of the company along some such lines as we discussed with you yesterday."

Gilchrist's reply was as follows:

"If the plan for the organization of the Walville Lumber Co. as outlined in yours of the 13th shall be consummated, my associates and I will take the $125,-000 of the $650,000 issue of bonds of the Walville property and pay you par therefor on delivery on or about August 1st next."

Following the execution of the agreement, the appellant corporation was organized with a capital stock of one million dollars. The stock was subscribed for by the parent corporation and paid for by the transfer from the old to the new corporation of all of the former's property and assets within the state of Washington. The new corporation assumed all of the Washington indebtedness of the old, issued and delivered to the old company its bonds in the sum of six hundred and fifty thousand dollars, and pledged its property as security therefor. Afterwards, Gilchrist and his associates advanced to the old company the sum agreed upon. The money was borrowed from a Seattle bank; Gilchrist and his associates giving their note therefor and pledging the bonds received by them as security for the payment of the note. At the time the advancement was made, Gilchrist insisted that sufficient of the stock of the new corporation be transferred to him and his associates to give them a controlling interest therein. This agreement was also put in writing, Gann dictating the form thereof. It read as follows:

"I have received of the Walworth & Neville Manufacturing Company, 3755 shares of the capital stock of the Walville Lumber Company, which I am to hold as trustee for said Walworth & Neville Manufacturing Company for its benefit, until the $75,000, now owing in Centralia to the United States National Bank and others, shall have been liquidated and until I personally and my associates shall be relieved of the obligations now existing against us, arising from the underwriting of $125,000 of bonds of the Walville Lumber Company.

"When the indebtedness above referred to shall have been liquidated, as aforesaid, and we shall be relieved of said obligations, this trust shall terminate and the said shares of stock are to be surrendered to the Walworth & Neville Manufacturing Company, its successors or assigns."

Of the new corporation, one Neville was made manager. He was an officer and stockholder of the old corporation and, at the time it was placed in the hands of the creditors' committee, was its general manager. He and Mr. Gann became trustees of the new corporation. The other trustees, constituting a majority of the board, were selected by Mr. Gilchrist and his associates. The corporation subsequently retired its bond issue, and by its retirement satisfied in part the debt to the Seattle bank they were pledged to secure. The note given the bank by Gilchrist and his associates bore interest at the rate of eight per cent per annum. The bonds bore interest at six per cent. This difference of two per cent was paid by Mr. Gilchrist personally, and, owing to the time the obligation was outstanding, amounted to a considerable sum. When it reached approximately five thousand dollars, Mr. Gilchrist sent a statement of the amount to Neville, as manager of the new corporation, and requested that notes of the corporation be sent him to cover the

amount. Neville took the advice of Mr. Gann on the matter, and, receiving his approval, executed notes in the name of the corporation to cover the stated amount and sent them to Gilchrist. As the notes matured, they were paid in part and renewed in part. Notes were given, also, for additional interest as it matured, which were likewise paid in part and renewed in part as the exigencies of the corporation necessitated. The notes in suit represent the balance of this interest account unpaid at the time the trustee in bankruptcy took possession of the property of Mr. Gilchrist after the institution of the bankruptcy proceedings against him.

The appellant, in support of its claim that the notes were issued without consideration, argues that the transaction between Mr. Gann on the one side and Mr. Gilchrist and his associates on the other, by which the latter took bonds to the amount of one hundred and twenty-five thousand dollars issued by the appellant at the time of its organization, was in fact a sale and purchase of the bonds and hence any obligation the purchasers incurred in procuring the money with which to make the purchase was their own obligation, and not an obligation for which the appellant corporation owed any duty, either legal or moral, to assume or pay. To the charge that it did assume the obligation and did pay it in part, it answers that its acts in this respect were not voluntary; that it was then under the dominion and control of Mr. Gilchrist and his associates, certain of their number being on its board of trustees and constituting a majority of its board, and that, in substance and effect, the assumption was at their direction; that they as trustees of the corporation caused the corporation to pay them as individuals an obligation incurred by them for purposes other than the purposes of the corporation.

Noticing, first, the latter part of this argument, it is at once apparent that it is in effect a charge of fraud against Mr. Gilchrist and his associates. As to this, the record makes it clear that there was no actual fraud. There was no meeting of the board of trustees of the corporation by which it was directed to assume and pay the obligation, nor is it shown that the associates of Mr. Gilchrist, who were members of such board, knew that it had been assumed and paid in part by the corporation until long after their connection therewith had ceased. That Mr. Gilchrist himself acted in good faith is also borne out by the record. It was his contention from the beginning that he and his associates were not purchasers of the bonds; his contention was, and at all times has been, that they were merely loaning their credit to the parent corporation that it might redeem itself from its existing financial embarrassment and continue as a going concern. True, there was a motive for the act other than a mere desire to aid the corporation. This motive was to keep the corporation a going concern that it might ultimately pay the large obligation it owed to the bank of which he was vice-president and manager. His judgment was that the scheme adopted would enable the corporation to pay its obligation. That his judgment was sound, subsequent events abundantly proved. Nor does Mr. Gann or Mr. Neville make any charge of actual fraud. They were likewise both trustees of the appellant corporation, and in so far as there were opposing interests on the board, they represented the opposing interest. Their version of the affair is that, while they did not recognize the obligation as one owing by the appellant corporation, they felt that they could not then afford to antagonize Mr. Gilchrist by denying his request or by making it a subject of consideration of the trustees as a body. They say that the

appellant, after its organization, owing to its inability to find at all times a ready market for its products, was at times unable to meet its obligations as they matured, and that Mr. Gilchrist tided it over these times of difficulty by advancing for its use the necessary funds. That these advancements were required somewhat frequently; that at times they amounted to large sums; that the corporation had no other source from which funds could be obtained; and that disaster would certainly result if Mr. Gilchrist withdrew his support, hence they felt compelled to acquiesce in his request. If, therefore, there was fraud in the transaction at all, it was constructive, rather than actual fraud, and this in turn depends on the answer to the question whether the obligation assumed was in fact the obligation of the corporation.

On this latter question we are inclined to the view of the trial court. The appellant rests its contention largely on the letters passing between the parties at the Portland meeting. These, standing alone, lend color to the contention, but when viewed in the light of the surrounding circumstances, we think they will bear another interpretation. While they appear to be somewhat carelessly worded, there is but little doubt that they were prepared with care and that the language used was carefully considered. It must be remembered that the letters were not the work of novices. On the one side was an able and distinguished lawyer, and on the other business men of capacity used to dealings in large affairs. It will be noticed that the wording is to "take" the bonds. Nowhere in either of the writings is the word "purchase" used, and while we may freely concede that, under other conditions, the agreement could be found to be an agreement for a sale and purchase, yet it is capable of another construction, and what this construction should be is, to our minds, made.

clear by the writing passing between the parties at the time the agreement was consummated. In this writing the agreement is referred to as an "obligation now existing against us, arising from the underwriting of one hundred and twenty-five thousand dollars of bonds of the Walville Lumber Company." This language, it seems to us, can have but one meaning. It means that the transaction was a guarantee of a loan in that sum made to the corporation on the security of the bonds, not an outright purchase of the bonds.

The oral testimony introduced by the parties as explanatory of the transaction, we shall not review. It is enough to say that it is conflicting, and does not decidedly preponderate in favor of either contention.

It would be unprofitable to pursue the inquiry further. In our opinion, the judgment should stand affirmed, and it will be so ordered.

PARKER, C. J., HOLCOMB, MACKINTOSH, and BRIDGES, JJ., concur.